UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY BUILDING LABORERS' STATEWIDE PENSION FUND AND TRUSTEES THEREOF,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD A. PULASKI CONSTRUCTION, R. PULASKI & SONS CONSTRUCTION, INC., PULASKI BROTHERS CONSTRUCTION, INC, and R.A. PULASKI CONSTRUCTION COMPANY, L.L.C.<br><br>Defendants. | Civil Action No.: 14-cv-4919 (PGS)<br><br><br>MEMORANDUM AND ORDER |

SHERIDAN, U.S.D.J.

The New Jersey Business Laborers' Statewide Pension Fund and the Trustees thereof (Pension Fund) brought this action to recover withdrawal liability due to it from Pulaski Construction (the Signator), asserting claims "against a construction family on the basis of successor liability . . ." (Defendants' Trial Brief at 2 (ECF No. 79)). This action is governed by the Employee Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001, *et seq.*, specifically § 4301 of ERISA, 29 U.S.C. § 1451. (Stipulated Facts ¶1).

### ROLE OF THE COURT

In this case, the Court has three roles. First, as trier of fact, the Court's duty is to decide the facts from the evidence that was heard and seen in court during the hearing. The second duty is to apply the law to the facts. The third duty is to clearly explain the facts and the legal principles underpinning the Court's decision.

1

Like any jury, the Court performs these duties fairly and impartially. The Court will not allow sympathy, prejudice, fear, or public opinion to influence its decision. The Court will not be influenced by any person's race, color, religion, national ancestry or gender. Here, both parties stand on equal footing. Since the Court's decision is based upon evidence seen and heard in the courtroom, the Court followed the same guidelines as a jury would in determining the evidence and what weight should be given to it.

The Court did not let rumors, suspicions, or anything else that it may have seen or heard outside of the court influence its decision in any way. In order to assess the evidence, the Court used common sense, and considered it in light of everyday experience with people and events; and as such, the Court gave the evidence whatever weight it believed it deserved. *See* Model Jury Charge 1.5.

The evidence in this case primarily consisted of the testimony of two witnesses: Richard Pulaski and Gary Ramsey. Both witnesses were honest and forthright.

### BURDEN OF PROOF

Plaintiff presented three theories of withdrawal liability: alter ego liability; successor in interest liability; and control group liability. Although these theories overlap, there are some differences and each is discussed separately in the "Conclusions of Law" section below.

The burden of proof for establishing any of the three theories "rests with the party attempting to negate the existence of a separate entity." *Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 197 (3d Cir. 2003). Alter ego liability must be established by clear and convincing evidence, *id.* at 192, and is "notoriously difficult for plaintiffs to meet." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001).

## FINDINGS OF FACT

The Pension Fund was and still is a trust fund established and maintained pursuant to § 302(c)(5) of the Labor Management Relations Act, ("LMRA"), 29 U.S.C. § 186(c)(5), and an employee benefit plan within the meaning of § 3 of ERISA, 29 U.S.C. § 1301(a)(3). The Pension Fund qualifies to commence this action under §§ 502(d)(1) and 4301(a)(1) of ERISA, 29 U.S.C. §§ 1132(d)(1), 1451(a)(1). (Stipulated Facts ¶2). The Trustees of the Pension Fund are fiduciaries and, as such, are entitled to bring and maintain this action under § 4301(a)(1) of ERISA, 29 U.S.C. § 1451(a)(1). (Stipulated Facts ¶3).

Pulaski Construction (hereinafter, the "Signator") was subject to a Collective Bargaining Agreement ("CBA") with the New Jersey Construction Building Laborers District Council ("Union") for work performed within the Union's jurisdiction. (Stipulated Facts ¶8) (Plaintiff's Exh. 5). Named Defendants are not the Signator, but are alleged to be the "alter ego" of the Signator, since they are family members who operated the Signator. Under the terms of the CBA, the Signator was obligated to hire members of the Union, and to pay wages and benefits. (Stipulated Facts ¶9). Said payments and benefits were paid until April 2012; Signator defaulted on payment thereafter. At that time, the amount due to the Pension Fund was $87,152.00.

The Pension Fund brought an action for the amount owed against the Signator, and a default judgment in the amount of $137,017.12 was awarded. This included principle, legal fees, costs, interest, and liquidated damages. (Stipulated Fact ¶24). Since the Signator was defunct, the Pension Fund brought this suit against Pulaski Brothers Construction Co., Inc. (Brothers), R. Pulaski & Sons Construction, Inc. (Sons) and Richard A. Pulaski Construction based on successor liability theories.

Patricia Pulaski has three sons, Richard, Ronald, and Rob. Patricia is 82 years of age. Her

sons have worked in the construction business for a number of years. Richard testified he first began work in construction in 1976 and he has remained in the construction business ever since. (Tr. 106:20-23). In 1984, Ronald Pulaski formed the Signator, in which he was the owner and Richard was the manager, supervisor and contract negotiator. (Tr. 7:7-13; Stipulated Facts ¶¶34-35). Patricia was never involved in any capacity with the Signator. (Tr. 112:1-4). The Signator primarily worked on heavy construction projects, which involved the hiring of union labor. (Tr. 43:22-25). It entered contracts to construct hospitals, hotels, arenas and schools, as well as large private sector projects. Examples of such construction projects include: (a) contract between Signator and Middlesex County dated January 18, 1990 (Defendants' Exh. 6); (b) contract between Sordoni Shansha and Signator dated October 20, 2000 for construction of Robert Wood Johnson Foundation (Defendants' Exh. 7); and (c) contract between Signator and Hill Construction, for construction of a library (Defendants' Exh. 8). Each of these heavy construction projects involved a CBA and the Pension Fund. At the height of its success, the Signator employed hundreds of union members, including those union laborers subject to the Pension Fund. (Tr. 97:16-17; 101:5-18). The Signator was affiliated with another Pulaski company, R&R Pulaski, LLC, which owned real estate including an office building and yard located at 2115 Hamilton Avenue, Hamilton, New Jersey.

In any event, after about 15 years of heavy construction operations, the Signator's success ebbed, and losses mounted in or about 1999-2000. (Tr. 88:15-17). At the time, the Signator was constructing the Sovereign Bank Arena in Trenton, New Jersey. The contract price negotiated was far less than the actual cost of construction (Tr. 32:3-20).

In or about 2008, the Signator's affiliate, R&R Pulaski, LLC, borrowed $1.6 million to pay off vendors and other creditors. (Tr. 89:13-22; Defendants' Exh. 13). R&R Pulaski mortgaged the

real estate and the office building at 2115 Hamilton Avenue, as well as other real estate located on Youngs Road. As security for the loan, R&R Pulaski pledged all of the heavy equipment and real property it owned. (Tr. 91:15-21).

In July 2012, Signator's business financially crumbled. Richard Pulaski testified at deposition that the Signator ceased operations when it ran out of work. (Stipulated Fact ¶41). At some point, the mortgagee, LRL, LLC, evicted the Signator's affiliate from the Youngs Road warehouse/shop and seized all the equipment owned by the Signator. The lender also levied upon the heavy construction equipment and other assets, all of which were sold at an auction by LRL, LLC. (Tr. 92:6-18). Later that year, First Choice Bank, an affiliate of LRL, LLC, foreclosed on the 2115 Hamilton Avenue property, and was subject to a sheriff's sale. (Tr. 91:21-92:8). In 2012, the Signator's bank accounts were also levied upon and closed due to negative balances. (Stipulated Fact ¶42). In addition, some of the leased equipment and vehicles were repossessed by the leasing company. (Stipulated Fact ¶60).

Thereafter, First Choice Bank, as the foreclosure purchaser, approached the Pulaskis and offered to permit them to remain in the office building at 2115 Hamilton Avenue, rent-free and utility-free, for a short period of time. The Pulaskis agreed and remained on the premises and now lease the property from First Choice Bank. (Tr. 93:1-8).

At this time, Richard Pulaski and his brother, Ronald, each personally filed for Bankruptcy under Chapter 11, which was later converted to Chapter 7. The Signator and its affiliates were listed in both petitions. Thereafter, the Bankruptcy Court discharged them of all debts that they were personally liable for. (Tr. 94:1-25). Richard acknowledged that the Signator could have filed a Chapter 7 bankruptcy, but it did not do so since the Signator's lawyers advised that since it had no assets, there was no reason for it to file for bankruptcy. (Tr. 95:19-23).

More than a year after the bankruptcy proceedings, in December 2013, Ronald Pulaski created a new construction company that would *not* undertake projects involving union laborers. His mother, Patricia, agreed to finance the start up of the company. The new company was named Pulaski Brothers Construction Co., Inc. (hereinafter "Brothers") and was incorporated in January 2014. (Tr. 37:4-11; T. 38:3-10). Evidently, the mother allowed Brothers to use her credit line to purchase materials for the business.

At its inception, Brothers was solely owned by Patricia. Her sons, Richard, Ronald and Robert were employees. (Tr. 8:8-10). Richard handled contract negotiations (Tr. 6:15-25), Ronald supervised the field work (Tr. 7:5-13), and Robert, who is disabled, worked occasionally as laborer and carpenter. (Tr. 7:17-25). Brothers retained the previous bookkeeper of Signator, Eileen,[1] and an administrative assistant, Kayla Dowd. (Tr. 10:7-17). As of July 2016, it had two additional workers on the payroll, for a total of about seven employees. (Defendants' Exh. 14; Tr. 61:18-25; 62:1-15).

According to the testimony, Brothers consistently confined its work to residential and light commercial construction. Presently, Brothers is working on the Straube Center in Pennington, New Jersey, performing drywalling, spackling and installing ceilings (Tr. 12:8-14). Only two people are working on that job, Ronald and an independent subcontractor named Curt, who installs metal studs and sheetrock, and spackles ceiling tiles. (Tr. 12:15-13:1-2). Brothers has not undertaken any projects where heavy construction equipment, such as a crane, is utilized. Instead, its work focuses primarily on jobs where hand-held tools are used. (Tr. 98:19-99:9). Brothers still uses the same phone number as Signator and operates from the its former location; however, it now leases the property. (Tr. 92:21-25; 93:1-23).

---

[1] Eileen is deceased. (Tr. 42:15-22).

6

During the trial, Richard Pulaski noted the difference between heavy construction and light construction. He stated:

> Q.   You use what you call heavy versus light construction; can you elaborate what the difference is?
>
> A.   Yes. The previous company that was signatory to your labor agreement, for instance when it built the arena had nine cranes on site; it had 11 high lists; it had heavy equipment to do that project, similar to other projects that the company did that were prevailing wage -- state-required prevailing wage funds; it had a lot of large drilling equipment. The company built the Hamilton Transit Train Station and drilled caissons along the railroad and had drilling equipment and cranes, just heavy construction work that is more associated with the prevailing wage work.
>    You don't go into the center in Pennington to do a $9,000 wall and use any of that type of equipment. It's a completely left and right distinction. And the company particularly, my brother Ron just absolutely refuses to go back into that world, you know, he got his brains beat in.

(Tr. 43:22-44:13).[2]

The Pension Fund presented a different view of Brothers' operation. According to Plaintiff, there is an advertising book for contractors, the Blue Book Network, which is marketed to the construction industry to enable contractors to easily access other participants in the industry. (Plaintiff's Exh. 22). It is akin to the Yellow Pages. (Tr. 68:9-16). In the Blue Book, Brothers indicated it has been in business since 1976 and that "Brothers had completed hundreds of projects." (Tr. 72:2-22). Richard Pulaski explained that the representations set forth in the Blue Book were in reference to his experience gained through the Signator. Plaintiff argues that these representations demonstrate that Brothers is operating as the alter ego of the Signator and, as such, is liable for the default judgment.

Brothers disagrees, contending that these representations were about Richard Pulaski's personal experience. For example, Richard agreed that the Blue Book credits Brothers with the

---

[2]   By using the term "go[ing] into the center of Pennington to do a $9,000 wall," Richard Pulaski is referring to the Straube Center work. (Plaintiff's Exh. 5).

7

construction of arenas, auto dealerships, banks and churches; however, he explained that this was a reflection of his personal experience. (Tr. 83:17-85:1). Richard also acknowledged that his vast experience in the construction industry is an asset to Brothers; as Richard explained, his 40 years of experience would certainly be an aspect of their business that would draw in new work. (Tr. 85:22-86:24). Richard also confirmed that Brothers performs both residential and commercial construction, (Tr. 111:14-22); that Brothers' bookkeeper, Eileen previuosly worked for the Signator in the same capacity, (Tr. 111:13-14); and that Richard and Ronald have both been employed by Brothers and the Signator. (Tr. 112:20-113:5)

There is another company, R.Pulaski & Sons Construction (hereinafter, "Sons"), that was established by Richard, which "is used only for snow plowing in a few months in the winter." (Tr. 11:15-17). Sons is owned solely by Richard and operates out of 2115 Hamilton Avenue. (Tr. 11:19; Tr. 113:6-8; Stipulated Facts ¶¶57-58). Richard testified that Sons is different from the Signator because the Signator used laborers, while Sons employs truckdrivers. (Tr. 108:6-14). There were three snowplowing proposals and one contract submitted as exhibits. (Defendants' Exhs. 19, 20, and 22). None of those proposals or the contract generated substantial money.

Gary Ramsey testified on behalf of the Pension Fund at the trial. Mr. Ramsey is a business representative of the Pension Fund, who is responsible for ensuring that the terms and conditions of CBA are enforced. Mr. Ramsey noted that laborers dig, excavate, backfill, tamp, pour concrete, tend to different trades, perform demolition, landscape, and cleanup all debris from the job sites. (Tr. 115:24-116:19). These job sites, according to Ramsey, include office buildings and strip malls. (Tr. 116:7-19). Ramsey confirmed that laborers could have performed some of the work at the Straube Center, the Robbinsville parking lot, and the demolition at the Flemington Holiday

Inn – all projects undertaken by Brothers (Tr. 117:14-119:5). Hence, Mr. Ramsey concluded that Brothers is carrying on the same kind of business as the Signator.

There are two other facts which I gave little weight. First, there was another company known as Richard A. Pulaski Construction and/or RAP Construction, which performed private residential projects; however, RAP Construction ceased operations due to a lack of money. (Stipulated Facts ¶¶54, 56). According to Richard, RAP Construction was "sort of a holding company that got created for a short period of time." (Tr. 42:20-43:2). Second, there was one check payable to the New Jersey Building Laborers' Statewide Benefits Funds from RAP Construction (Plaintiff's Exh. 16). The reference on the check is Greg Konopka, an ex-laborer. (Stipulated Fact ¶64). The Pension Fund argues that the check evinces the intermingling of funds between Pulaski corporate entities, and that this shows that Signator and Brothers and Sons were acting as one company. However, there was little to no other evidence presented that concerned this check. It appears that Eileen may have processed this check, but she did not testify because she is deceased, and there was no other testimony to explain what occurred. (Tr. 42:15-22). Additionally, there was little testimony concerning RAP Construction, other than it no longer exists. In sum, Plaintiff has failed to come forth with sufficient facts that demonstrate that RAP Construction was a successor or alter ego of the Signator.

## CONCLUSIONS OF LAW

This a withdrawal liability case. Plaintiff argues that ERISA is designed "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984). In the construction industry, "a significant number of [multiemployer] plans were experiencing extreme financial hardship" as

a result of individual employer's withdrawal from the plans, which saddled the remaining employers with increased funding obligations. *Id.* at 721. These withdrawals caused a domino effect of cascading additional withdrawals that eventually "could have resulted in the termination of numerous plans." *Id.* Accordingly, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381, *et al.* This statute "imposed a withdrawal charge on all employers withdrawing from an underfunded plan." *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995). This statute requires employers in the construction industry to make contributions, even if there has been a withdrawal by the employer under certain circumstances. 29 U.S.C. § 1383(b)(1). That is, a complete withdrawal occurs only if:

> (A) an employer ceases to have an obligation to contribute under the plan, and
>
> (B) the employer--
>
>> (i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or
>>
>> (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

29 U.S.C. § 1383(b)(2)

Obviously, the law protects the employees, and it seeks to foster the financial viability of workers' vested pension plans. *DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442, 454 (3d Cir. 2002). Plaintiff argues that the withdrawal liability of Signator extends to Brothers and Sons by virtue of their relationship to the Signator. Specifically, since Richard and Ronald Pulaski, through Brothers and Sons, continue to construct projects, they are obligated to pay the withdrawal amount due of Signator. *See N.J. Carpenters Pension Fund v. Housing Auth. & Urban Redevelopment Agency of the City of Atl. City*, 68 F. Supp. 3d, 545, 557-58 (D.N.J. 2014).

In defining who is an "employer," for purposes of withdrawal liability, courts have imposed liability upon entities that are the alter ego, successor, or member of a controlled group, requiring them to pay the withdrawal liability of the employer who was responsible for remitting contributions to the pension fund. *Korea Shipping Corp. v. New York Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Trust Fund*, 880 F.2d 1531, 1536 (2d Cir. 1989). Each of these theories is discussed below.

1. *Alter Ego Liability*

The alter ego doctrine is meant to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making "a mere technical change in the structure or identity of the employing entity ... without any substantial change in its ownership or management." *NLRB v. Hosp. San Rafael, Inc.*, 42 F.3d 45, 51 (1st Cir.1994) (internal quotation marks and citation omitted).

In applying the alter ego doctrine, one must ask whether the companies have "substantially identical management, business purpose, operation, equipment, customers, and supervision, as well as ownership." *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 146 (3d Cir. 1994). A plaintiff need not establish all of these factors to prove alter ego status. *Id.* "[A]n intent to evade [LMRA or ERISA] is an important, but not an essential, factor." *Id.* at 151; *see also Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307-09 (1st Cir. 1998). This test is applied with a degree of flexibility, in light of the general federal policy of piercing the corporate veil when necessary, to protect employee benefits. *Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holdings A.S.*, 629 F.3d 282, 288 (2d Cir. 2010); *Leddy v. Standard Dry Wall, Inc.*, 875 F.2d 383 (2d Cir. 1989).

Here, when considering the factors discussed above, Brothers or Sons are not alter ego companies of Signator. There is no doubt that there is identical management and supervision of both Brothers and Sons with that of Signator. However, the business purposes of these companies are different. The Signator focused on heavy construction and on large commercial projects such as the Sovereign Bank Arena. By contrast, Sons is involved exclusively in snow removal – a far different purpose than the Signator; and Brothers is involved in light construction projects, such as constructing walls or building small parking lots. As noted above, light construction is different from heavy construction. For instance, the Signator, which undertook heavy construction projects, had hundreds of union employees and used heavy equipment at its job sites; however, Brothers manages much smaller projects, like the Straube Center, and has less than 10 employees. Moreover, these projects do not use heavy equipment; instead, hand-held tools are primarily used for performing small jobs like installing drywall and spackling. In short, although Brothers involves construction, the scope of its duties is far different from the Signator's; and Sons' snow removal business is far different from heavy construction projects.

Moreover, "the alter ego doctrine was developed to prevent employers from evading obligations . . . by changing or altering their corporate form." *N.J. Carpenters*, 68 F. Supp. 3d at 557-58. This is not the case here. The difference between the Signator and Brothers and Sons is dramatic. Signator lost its properties, its heavy equipment and its bank account holdings when its business went into arrears. In creating Brothers and Sons, the Pulaskis did not merely change Signator's corporate form; instead, it was initiated by using a credit line from Patricia and operates without any heavy equipment or ownership of land. Brothers and Sons have a far different purpose than the Signator, which is not the result of a corporate or technical change of ownership.

2. *Successor Liability*

12

Plaintiff next argues that the doctrine of successorship liability applies to this case. This doctrine applies where a successor company purchases the assets of a company, but does not acquire the seller's liabilities. *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995). The successorship liability doctrine is invoked where the transfer of the assets undermines federal labor interests, such as failure to pay employee benefits to a union pension fund. *Sullivan v. Dollar Tree*, 623 F.3d 770, 780-81 (9th Cir. 2010). Generally, the doctrine may be applied where, under the totality of the circumstances, "there is a 'substantial continuity' between the enterprises." *Hawaii Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d. 289, 293 (9th Cir. 1987) (quoting *Fall River Dyeing and Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987)). As the *Sullivan* Court noted, fairness is a prime consideration in its application. *Sullivan*, 623 F.3d at 782. In determining fairness, courts consider a number of factors:

(a) whether there has been a substantial continuity of the same business;
(b) whether the same employer uses the same plant;
(c) whether the same work force is used;
(d) whether the same jobs exist under the same working conditions;
(e) whether the same machinery, and/or equipment is used;
(f) whether the same supervisors are employed;
(g) whether the same methods of production are used;
(h) whether the same product is produced;
(i) whether the body of customers is the same.

*NLRB v. Jeffries Lithograph*, 752 F.2d 459, 463 (9th Cir. 1985) (quoting *Premium Foods Inc.*, 260 N.L.R.B. 708, 714 (1982)).

In reviewing all of these factors, the successorship liability doctrine does not apply to Brothers and Sons. First, the doctrine applies when there has been a purchase of assets by the successor entity. Here, Signator lost its real property, its heavy equipment and its bank accounts to creditors. Hence, Brothers and Sons never purchased any assets of Signator.

Second, Plaintiff has not shown a substantial continuity of the same business (factor (a)). As discussed above, Sons is involved in snow removal and Brothers is engaged in light construction, whereas Signator was involved in heavy construction.

Third, Plaintiff has not shown that the same workforce was used (factor (c)). The evidence presented established that the Signator had employed hundreds of union members; by contrast, Brothers only employs two non-family individuals – Curt, who was working on the Straube Center project, and Eileen, the bookkeeper, who passed away.

Fourth, the nature of the business is different because Brothers does not use heavy equipment (factor (e)); employ hundreds of union employees (factor (g)); or undertake large projects, like Sovereign Bank Arena (factor (h)).

Fifth, Plaintiff has not shown that the body of customers is the same (factor (i)). The Signator had customers such as the County of Mercer (Sovereign Bank Arena), hospitals, hotels and schools; however, Brothers and Sons are limited to residential and small business clients.

Sixth, Plaintiff has not shown that the ownership of plant area is the same (factor (b)). Although the businesses are based out of the same location, 2115 Hamilton Avenue, Signator was the prior owner of real estate -- today, Brothers and Sons are tenants.

3. *Controlled Group Liability*

Finally, the Pension Fund contends that, under the controlled group theory, Brothers and Sons remain liable. The Multiemployer Pension Plan Amendments of 1980 (MPPAA) extends liability to "trades or businesses (whether or not incorporated) which are under common control" of an employer. 29 U.S.C. § 1301(b)(1). The purpose of the MPPAA is to "protect multiemployer pension plans from the adverse consequences that result when individual employers terminate their participation or withdraw" and to impose a withdrawal charge on all employers, who withdraw

from underfunded employee plans. *Warner-Lamber Co. v. United Retail and Wholesale Employee's Teamster Local No. 115 Pension Plan*, 791 F.2d 283, 284 (3d Cir. 1986). While the statute itself does not define specifically "under common control," it "adds that regulations implementing this provision 'shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c)'" of the Internal Revenue Code. *United Food & Commercial Workers Union v. Progressive Supermarkets*, 644 F. Supp. 633, 637 (D.N.J. 1988) (quoting 29 U.S.C. § 1301(b)(1)).

Under the operative definition of "common control," companies are essentially held to be under common control "where five or fewer persons own at least 80% of the voting stock or share value of each corporation, and the same persons own more than 50% of the voting stock or share value, taking into account each person's interest only to the degree of identical stock ownership in each corporation." *Doherty v. Teamsters Pension Trust Fund*, 16 F. 3d 1386, 1390 n.3 (3d Cir. 1994) (citing 26 U.S.C. § 1563(a)(2)). When enacting the common control theory, Congress sought to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities. *See Brown v. Astro Holdings*, 385 F. Supp. 2d 519, 530 (E.D. Pa. 2005).

In order to extend withdrawal liability to other entities, one must show that the entity is (1) a trade or business; and (2) under common control with the withdrawing employer. *Gov't Dev. Bank for P.R. v. Holt Marine Terminal, Inc.*, 765 F. Supp. 2d 710, 714-15 (E.D. Pa. 2011). To prove factor one, courts have relied on the tax law (IRS) definition of trade or business. *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987). In *Groetzinger*, Justice Blackman explained that to be engaged in a trade or business one "must be involved in an activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Id.* In reviewing trade or businesses, courts have added an additional inquiry. That is, "whether

characterizing an entity as a 'trade or business' will fulfill the underlying purpose of the MPPAA: to prevent employers from avoiding withdrawal liability by fractionalizing their operations." *Gov't Dev. Bank.*, 765 F. Supp. 2d at 715.

In applying this test, Brothers and Sons are trades (factor 1), in that each conducts business in either residential construction or snowplowing with regularity;[3] and the goal is to earn income. Secondly, Brothers and Sons are controlled by Richard and Ronald.[4]

The last factor is whether Brothers and Sons attempted to fractionalize their business from the Signator to avoid payment of withdrawal liability. There is little evidence to support such a finding. Richard testified and explained how Brothers and Sons were created, none of which were to avoid payment of withdrawal liability. For example, Richard testified that the only way he knew how to earn money was in the construction industry. He noted, facetiously, that after the collapse of Signator, it was too late for him to become a doctor and testified that he could only make a living doing something he learned over the years. (Tr. 107:16-21). He also made clear that he did not wish to return to heavy construction because, as Ronald had stated, he "got [his] brains beat in." (Tr. 44:13). Secondly, when considering whether the Signator was fractionalized, the Court considered whether Brothers and Sons acquired the Signator's assets. Here, that is not the case. Brothers started on Patricia's line of credit, and there is no evidence of any transfer of any large scale holdings of assets from the Signator to Richard, Ronald, Robert, Brothers or Sons.

In conclusion, the Pension Fund has failed to establish sufficient evidence to prove Brothers and Sons were established to fractionalize operations in order to avoid payment of withdrawal liability. Here, Brothers and Sons were established to eke out a living. As such, since

---

[3]   Snowplowing is more seasonal work, but it mostly likely occurs several times each year.
[4]   Although Patricia technically owns Brothers, Richard testified that he oversees the operation of the company and makes all business decisions.

16

none of the three theories of withdrawal liability apply, Plaintiff's request for judgment against Defendants is denied.

### ORDER

IT IS on this 16th day of May, 2018;

ORDERED that the Complaint of New Jersey Building Laborers Statewide Pension Fund for judgment against Richard A. Pulaski Construction is denied. The Complaint is dismissed with prejudice against Richard A. Pulaski Construction, R. Pulaski & Sons Construction, Inc., Pulaski Brothers Construction, Inc, And R.A. Pulaski Construction Company, L.L.C

_____
PETER G. SHERIDAN, U.S.D.J.